2020 IL App (1st) 160327-UB

No. 1-16-0327

December 28, 2020

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 99 CR 15711 |
| | ) | |
| RONALD SMITH, | ) | Honorable |
| | ) | Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE WALKER delivered the judgment of the court.
Justices Hyman and Pucinski concurred in the judgment.

**ORDER**

¶ 1     *Held*:    The circuit court's denial of defendant's *pro se* motion for leave to file a successive postconviction petition is reversed and remanded for further proceedings where defendant presented a colorable claim of actual innocence.

¶ 2     Following a 2001 jury trial, defendant Ronald Smith was found guilty of first-degree murder (720 ILCS 5/9-1(a)(1) (West 1998)) and sentenced to 35 years in prison. In 2015, defendant filed a *pro se* motion for leave to file a successive postconviction petition alleging actual innocence based on newly discovered evidence that (1) Darrell Harris, a newly discovered eyewitness,

observed defendant standing down the street from the victim at the time of the murder, and (2) defendant's signed, written statement was a product of police coercion. The circuit court denied leave to file the successive petition. We affirmed, finding that defendant failed to present a colorable claim of actual innocence because Harris's affidavit did not raise the probability that a reasonable jury would not convict defendant considering the overwhelming evidence of his guilt. See *People v. Smith*, 2019 IL App (1st) 160327-U, ¶ 46.

¶ 3    On September 30, 2020, our supreme court denied a petition for leave to appeal filed by defendant but directed this court to vacate our judgment and reconsider the matter in light of *People v. Robinson*, 2020 IL 123849, to determine whether a different result was warranted. See *People v. Smith*, No. 124963 (Ill. Sept. 30, 2020) (supervisory order). After reconsideration, we conclude that defendant has presented a colorable claim of actual innocence. Therefore, we reverse the circuit court's judgment and remand for further proceedings under the Act.

¶ 4                                          BACKGROUND

¶ 5    We recount the background of the case only to the extent necessary to resolve the issues on appeal. Prior to trial, defendant filed a motion to suppress evidence of his oral and written statements to police. Defendant argued that he only signed a written statement because the police told him that he could go home if he did so. Defendant further contended that he was not informed of his *Miranda* rights prior to interrogation and that he was unable to understand his *Miranda* rights "due to [his] physical, physiological, mental, education, and/or psychological state, capacity, and condition."

¶ 6    At a pretrial hearing on the motion, Chicago police detective David Wright testified that he was present when defendant signed the handwritten statement on June 14, 1999. Wright stated

that defendant had been advised of the *Miranda* rights before an earlier interview that day and that, prior to defendant signing the written statement, Assistant State's Attorney John O'Grady readvised him of his rights. Wright had no difficulty communicating with defendant, and defendant did not indicate that he was unable to understand his rights on either occasion. Wright did not hear anyone tell defendant that he could go home if he signed a confession.

¶ 7 O'Grady also testified that he advised defendant of the *Miranda* rights, which defendant stated he understood, and that he had no difficulty communicating with defendant. O'Grady denied hearing anyone tell defendant he could go home if he signed a confession.

¶ 8 Defendant testified that he turned himself in at a police station upon hearing that Detectives Wright and James Sanchez were looking for him. At the police station, defendant met with Sanchez after waiting about five minutes. Sanchez took defendant to an interview room, locked the door, and left without providing the *Miranda* warning to him. Wright came in about 30 minutes later and told defendant that the police "wanted [him] as a witness and [he] would be out of there in no less than four or five hours." Wright proceeded to interview defendant for about 30 minutes without reading him the *Miranda* rights. Approximately "thirty minutes to an hour" after the interview, Sanchez came in to "check on" defendant and asked him "if [he] needed a cigarette or something." O'Grady arrived "a couple of hours after" Sanchez and conducted two separate interviews with defendant. During the first conversation, which lasted "[n]o longer than twenty minutes," O'Grady did not advise defendant of the *Miranda* rights. Defendant asked O'Grady when he would be able to leave, and O'Grady replied, "don't worry about it, we'll get you out of here as quick as we can." Defendant offered to write down "exactly what happened," but O'Grady rejected the offer because he wanted all the witness statements to "coincide together."

¶ 9    Defendant next spoke with O'Grady "about an hour or two" later while Sanchez and Wright were present. None of the individuals Mirandized defendant. O'Grady presented defendant with a piece of paper and explained again that all the witnesses in the case were required to sign a statement and that "they had to all coincide." Defendant testified that he signed the written statement in multiple places "[b]ecause I thought I was a witness." He did not read the statement before signing it because O'Grady was "covering it up." Defendant asked if he could read the statement, but O'Grady refused.

¶ 10    The trial court denied defendant's motion to suppress. In so ruling, the court found that the State had proven by a preponderance of the evidence that defendant was advised of the *Miranda* rights, and that he was not told that he could go home if he signed a confession.

¶ 11    The case proceeded to a jury trial, where Deborah Dean testified that, at about 3:15 p.m. on June 10, 1999, she and her fiancé, Arnett Williams, walked from their apartment to the corner of Walnut Street and St. Louis Avenue. There, they encountered three men—defendant, Tony "Four-Tone" McGruder, and Albert "BD" Johnson—whom they knew from previous drug transactions. Williams owed drug debts to all three men and repaid all but $5 of what he owed to McGruder. Dean and Williams returned to the corner of Walnut and St. Louis around 8 p.m. and purchased crack cocaine from the three men. They went back to the corner again around 1:30 a.m. and attempted to purchase more crack cocaine on credit. When they arrived, defendant, McGruder, and Johnson were playing dice and drinking bottles of beer. As Williams was talking to Johnson, McGruder "jumped into the conversation" and yelled at Williams about the $5 he owed. Defendant also yelled at Williams, claiming that he owed him money as well. McGruder and Williams exchanged punches before Williams pulled out a box cutter and "grazed" McGruder. McGruder

screamed "this bitch, he scratched me. I'm going to kill this mother f***." Williams ran away as McGruder and defendant threw beer bottles at him. When Williams slipped and fell, McGruder hit him in the head with a bottle. Then, defendant and McGruder kicked Williams as he lay on the ground.

¶ 12    Dean and Williams fled to their apartment. Upon discovering that Dean lost her keys, Williams retraced his steps in search of them while Dean waited in front of the apartment. Dean next saw Williams as defendant and McGruder were chasing him toward the apartment. When Williams fell to the ground, McGruder punched his lower body and defendant kicked and punched his upper body and head. Johnson tried to pull McGruder off Williams but was unsuccessful. Johnson walked away toward Fulton Street. Dean saw McGruder "jab" Williams three times, although she did not actually see a weapon. Defendant and McGruder then fled.

¶ 13    Johnson's testimony was virtually identical to Dean's. In addition, Johnson testified that he heard McGruder say, "[H]e cut me. I'm going to kill this mother f***" after the first encounter with Williams. Johnson was standing on the corner of St. Louis and Walnut when Williams returned about five minutes later. Defendant and McGruder grabbed beer bottles out of a trash can, and McGruder said, "He cut me, I'm fitting to kill him." Defendant and McGruder chased Williams, both throwing beer bottles at him as he ran. Johnson watched the chase from near the alley between Fulton and Walnut. When Williams slipped and fell, defendant kicked and punched his "face and chest" while McGruder kicked and punched his lower body. Johnson ran over, grabbed McGruder's arm, and told him to "chill out," but McGruder pushed him away. As defendant continued to beat Williams, McGruder pulled out a pocketknife and stabbed Williams two or three times. Johnson fled, and was later apprehended by the police. He was taken to a police

station, where he identified a photograph of McGruder. Johnson acknowledged at trial that he was on probation for two previous convictions for delivery of a controlled substance, and that he had a different possession of a controlled substance case pending in the circuit court. However, he testified that the State had not made any threats or promises in exchange for his testimony.

¶ 14 Sanchez testified that he and Wright interviewed defendant at the police station on June 13, 1999. Before questioning defendant, Sanchez read him the *Miranda* rights. After reading each right, Sanchez asked defendant if he understood, and defendant responded affirmatively. Sanchez and defendant then had a "20 to 30 minutes" conversation during which defendant admitted to punching, kicking, and throwing beer bottles at Williams after they argued about Williams's drug debt. Defendant, Johnson, and McGruder then went back to their dice game, during which McGruder told defendant that "if Mr. Williams came back and he was able to catch him he was going to kill him." When Williams returned, defendant and McGruder chased him and threw beer bottles at him. Williams fell to the ground and defendant kicked and punched his upper body. McGruder pulled a knife and stabbed Williams. Defendant then fled.

¶ 15 O'Grady testified that, on the night of June 13, 1999, he traveled to the police station to interview defendant. With Wright present, O'Grady explained to defendant that he was a prosecutor, and informed him of the *Miranda* rights. Defendant stated that he understood each right and told O'Grady about his involvement in Williams's murder. O'Grady then had Wright leave the room so that he could talk to defendant alone. O'Grady asked defendant how the police had treated him. Defendant replied that they were treating him "fine," and had given him bathroom breaks, cigarettes, and soda. They did not threaten him or make him any promises.

¶ 16    O'Grady talked to defendant again "[a] few hours later" while Wright was present. O'Grady told defendant that he wanted to memorialize his earlier statement and explained the options for doing so. O'Grady offered to hand write a summary of defendant's earlier statement, allow him to make any changes, and then choose whether he wanted to sign it. Alternatively, O'Grady offered to bring in a court reporter to transcribe defendant's words verbatim, from which he could make revisions. Lastly, O'Grady stated that "the third option would be that we would just leave it as the oral statement he had already given me." Defendant replied that he wanted to do the handwritten option. O'Grady obtained a blank statement form with preprinted *Miranda* warnings at the top. Defendant read part of the *Miranda* warnings out loud to prove that he could read. O'Grady then wrote a "summary" of defendant's earlier statement while defendant was "reminding [him] or prompting [him]" about what to write. Defendant and O'Grady reviewed the written statement line by line, and defendant made several revisions. Defendant, O'Grady, and Wright initialed by the revisions and signed each page of the statement.

¶ 17    O'Grady read the statement to the jury. Before the handwritten portion, the preprinted *Miranda* rights section read:

> "I understand I have the right to remain silent and that anything I say can be used against me in a court of law. I understand that I have the right to talk to a lawyer and have him present with me during questioning. And if I cannot afford to hire a lawyer, one will be appointed by the court to represent me before any questioning. Understanding these rights, I wish to give a statement. Ronald Smith.
>
> After being advised and stating that he understood his constitutional rights, and after being advised and stating that he understood that John O'Grady is an assistant state's

attorney, a prosecutor, a lawyer, and not his lawyer, [defendant] states that he wants to give his statement, which is in summary and not in word-for-word form."

¶ 18   The handwritten portion stated that defendant, McGruder, and Johnson were playing dice when Dean and Williams approached them and asked to purchase crack cocaine on credit. Williams became upset when he was denied, and McGruder and defendant argued with him. McGruder and Williams "started swinging fists at each other," and Williams pulled out a box cutter and cut McGruder. Williams fled, and defendant and McGruder chased him with beer bottles in hand. They threw the bottles at Williams, caught up to him, and kicked him as he lay on the ground. Williams got up and ran away, and the others went back to their dice game.

¶ 19   After Williams left, McGruder stated that "he was going to kill [Williams] if he was able to catch [him]." Williams returned, and defendant and McGruder grabbed more beer bottles and chased him. When Williams slipped and fell, defendant and McGruder kicked him in the head and threw bottles at him. McGruder then pulled out a knife and stabbed Williams. Defendant fled.

¶ 20   The statement concluded:

"[Defendant] states that he has been treated find [*sic*] by the police and Assistant State's Attorney O'Grady. [Defendant] states he has only been here since the early evening and he has been allowed to use the bathroom whenever he wanted. [Defendant] states he has had cigarettes to smoke and pop to drink. [Defendant] states he is free from the effects of drugs and alcohol and he is giving this statement totally free and voluntarily.

[Defendant] states nobody has made any threats or promises to him for this statement. [Defendant] states he was told about the different ways his statement could be given. [Defendant] was told th[at] he could give his statement in handwritten form or in a

court reported form, or he could leave it as an oral statement only. [Defendant] states he

has chosen to make a handwritten statement.

[Defendant] states he has read this whole statement and he showed that he can read

English by reading the first typewritten paragraph of this statement out loud. [Defendant]

states he has been allowed to make any changes or corrections to this statement that he

wanted to."

¶ 21　Dr. Eupil Choi, a deputy chief medical examiner, testified that Williams's death was a

homicide caused by multiple stab wounds. Williams also had abrasions on his head and upper body

that Choi found were "consistent with someone who has been kicked and punched."

¶ 22　At closing, the State argued that defendant was accountable for the murder because he

"willfully joined in" when McGruder attacked Williams. In response, defense counsel

acknowledged that defendant chased, kicked, and threw beer bottles at Williams, but argued that

defendant did not share McGruder's intent to kill and did not know that he was carrying a knife.

¶ 23　The jury found defendant guilty of first-degree murder. The court denied defendant's

motion for new trial, which argued, *inter alia*, that it erred in denying defendant's pretrial motion

to suppress. After a hearing, the court sentenced defendant to 35 years in prison.

¶ 24　On direct appeal, defendant argued that the trial court erred by failing to adequately explain

the reasons for its sentencing decision and abused its discretion in imposing an excessive sentence.

*People v. Smith*, No. 1-01-1969 (2002) (unpublished order under Illinois Supreme Court Rule 23).

We affirmed. *Id.*

¶ 25　In April 2003, defendant filed an initial *pro se* postconviction petition, alleging that he was

denied effective assistance of counsel, that he was tried for an offense never presented to the grand

jury, and that the State failed to prove him guilty beyond a reasonable doubt. The circuit court summarily dismissed the petition, and we denied defendant leave to file a late appeal (*People v. Smith*, No. 1-03-2900 (2003) (dispositional order)).

¶ 26    Defendant filed a successive postconviction petition in March 2004, asserting, *inter alia*, actual innocence. The claim was based on an affidavit from Dean in which she acknowledged that defendant "had something to do with the frist [*sic*] part of the fright [*sic*]," but averred that he was "[n]ot invol[ved] with the actual killing of Arnett Williams" and "was not the one who cut him." Defendant also attached his own affidavit in which he averred that, on retrial, Dean would "recant" her original testimony and "add more detail" to the events described in her affidavit. In April 2004, defendant filed a motion to amend his successive petition, which the circuit court denied. On appeal, we found that the circuit court had neglected to rule on the successive petition itself, and consequently remanded for second stage postconviction proceedings because more than 90 days had passed since its filing. *People v. Smith*, No. 1-04-1774 (2006) (unpublished order under Illinois Supreme Court Rule 23). On remand, the circuit court granted the State's motion to dismiss. We affirmed the dismissal, and our supreme court denied defendant's *pro se* petition for leave to appeal.

¶ 27    In May 2008, defendant filed another *pro se* motion for leave to file a successive postconviction petition in which he alleged actual innocence based on a different affidavit from Dean. In this affidavit, Dean averred that defendant was involved in the "first part of the fight" wherein he and McGruder "hit and kicked" Williams. Dean and Williams ran home, but upon realizing that they had lost their keys, Williams returned to the scene of the fight and reengaged with McGruder. During this "second part of the fight," McGruder stabbed Williams. Defendant

was not beating Williams but was "down the street walking toward us to see what had happened" because Dean was screaming. McGruder fled on foot, and defendant followed without realizing what McGruder had done. The circuit court denied leave to file the successive petition on the grounds that Dean's new affidavit was unlikely to change the result on retrial. We affirmed, finding that the affidavit was neither newly discovered nor sufficiently exonerating considering the "overwhelming evidence of Defendant's accountability adduced at trial." *People v. Smith*, No. 1-08-2948 (2010) (unpublished order under Illinois Supreme Court Rule 23).

¶ 28    In April 2010, defendant filed a petition for writ of *habeas corpus* in federal court, raising, *inter alia*, actual innocence based on Dean's second affidavit. *U.S. ex rel. Smith v. Rednour*, No. 10 C 2767, 2010 WL 4363380 (N.D. Ill. Oct. 26, 2010), at *6. The federal district court dismissed the petition with prejudice. *Id.*, at *7.

¶ 29    In October 2008, July 2010, August 2011, and May 2012, defendant filed petitions for relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2012)). On each occasion, the circuit court denied relief and we affirmed after granting appellate counsel's motion to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987). *People v. Smith*, 2014 IL App (1st) 122557-U*; People v. Smith*, 2012 IL App (1st) 113264-U; *People v. Smith*, 2012 IL App (1st) 102843-U; *People v. Smith*, No. 09-0107 (2008) (unpublished order under Illinois Supreme Court Rule 23).

¶ 30    In January 2012 and October 2013, defendant filed two additional motions for leave to file successive postconviction petitions, both of which the circuit denied. We affirmed the denial of the January 2012 motion after appellate counsel moved to withdraw (*People v. Smith*, 2015 IL App

(1st) 132576-U), and the record does not show that defendant appealed the denial of the October 2013 motion.

¶ 31    Defendant filed another *pro se* section 2-1401 petition in March 2015, claiming actual innocence based on our supreme court's then-recent ruling in *People v. Fernandez*, 2014 IL 115527. The circuit court dismissed, finding that "*Fernandez* does nothing to exonerate [defendant] of criminal liability," because here "evidence presented [showed] that [defendant] kicked the victim with the co-defendant which led to his stabbing." The record does not show that defendant appealed.

¶ 32    On July 20, 2015, defendant filed the instant *pro se* motion for leave to file a successive postconviction petition, alleging that he was actually innocent because (1) Wright and O'Grady coerced him into signing a written confession, and (2) Harris's attached affidavit established that defendant was not beating Williams when McGruder stabbed him. In the affidavit, Harris, a fellow inmate at Western Illinois Correctional Center, averred that he was walking toward the corner of St. Louis and Walnut on the night of the murder when he heard glass breaking. He looked toward Fulton and saw defendant standing by the alley between Fulton and Walnut. Harris also saw a man being chased down St. Louis and Fulton by two other men, whom Harris did not recognize. The man being chased fell, and his pursuers began punching and kicking him. Harris noticed some money and dice on the ground, so he bent down to pick up the money. As he bent down, he heard a man scream. When Harris looked up, defendant was running away. One of the attackers was still kicking the man on the ground, and the other was stabbing him with a "shiny object." Harris ran away before anyone could see him. He explained that he did not come forward sooner because he

was scared, had stolen the money, and did not realize that an innocent man had been convicted of the murder before running into defendant in prison.

¶ 33    The circuit court denied defendant leave to file a successive postconviction petition, stating that his claim of police coercion was procedurally barred and not supported by the record. The court also found that defendant's claim of actual innocence failed because Harris's affidavit, which placed defendant at the murder scene, did not exonerate him.

¶ 34    We allowed defendant's late notice of appeal and affirmed, finding that defendant failed to present a colorable claim of actual innocence because Harris's affidavit did not raise the probability that a reasonable jury would not convict defendant considering the overwhelming evidence of his guilt. See *Smith*, 2019 IL App (1st) 160327-U, ¶ 46. On September 30, 2020, our supreme court denied defendant's petition for leave to appeal but directed this court to vacate our judgment and consider the effect of the supreme court's opinion in *People v. Robinson*, 2020 IL 123849, to determine whether a different result was warranted. See *Smith*, No. 124963 (Ill. Sept. 30, 2020) (supervisory order).

¶ 35                                    ANALYSIS

¶ 36    On appeal, defendant argues that the circuit court erred in denying him leave to file a successive petition because he stated a colorable claim of innocence based on Harris's affidavit. Additionally, defendant now styles his claim of police coercion as evidence that would undermine the strength of the State's trial evidence, thereby increasing the probability that Harris's affidavit would change the result on retrial.

¶ 37    The Act provides a statutory remedy to criminal defendants who allege substantial violations of their constitutional rights at trial. *People v. Edwards*, 2012 IL 111711, ¶ 21. The Act

is not a substitute for an appeal; rather, it is a mechanism for a defendant to assert a collateral attack on a final judgment. *Id*. The Act contemplates only one postconviction proceeding; however, this bar will be relaxed when a defendant can establish either cause and prejudice for failing to raise a claim in an earlier proceeding, or actual innocence. *Id.* ¶¶ 22-23. A defendant must therefore obtain leave of court to file a successive postconviction petition. *Id*. ¶ 24

¶ 38    A request to file a successive petition based on actual innocence is reviewed under a higher standard than the frivolous or patently without merit standard applied to an initial petition. *Id*. ¶¶ 25-29. The circuit court should deny leave to file a successive petition when it is clear from a review of the petition and supporting documentation that, as a matter of law, the petition cannot set forth a colorable claim of actual innocence. *People v. Sanders*, 2016 IL 118123, ¶ 24. Accordingly, leave of court should be granted where the petition and supporting documentation raises the probability that it is more likely than not that no reasonable juror would have convicted the defendant considering the new evidence. *Id*.

¶ 39    At the pleading stage of postconviction proceedings, all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true. *People v. Robinson*, 2020 IL 123849, ¶ 45. When determining the legal sufficiency of a postconviction petition, a court is precluded from making factual and credibility determinations. *Id.* We review the denial of leave to file a successive postconviction petition alleging actual innocence *de novo*. *Id*. ¶ 40.

¶ 40    To establish a claim of actual innocence, a petition's supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial. *Id*. ¶ 47. Evidence is newly discovered if it were

discovered after trial and a defendant could not have discovered it earlier through the exercise of due diligence. *Id.* Evidence is material when it is relevant and probative of a defendant's innocence, and noncumulative if it adds to the information that the fact finder heard at trial. *Id.* Conclusive evidence is evidence that, when considered with the evidence presented at trial, would probably lead to a different result at retrial. *Id.* "The conclusive character of the new evidence is the most important element of an actual innocence claim." *Id.* Therefore, the ultimate question is whether the evidence supporting the petition places the trial evidence "in a different light" and "undermines *** confidence in the judgment of guilt." *Id.* ¶ 48. Our supreme court has determined that the new evidence need not be entirely dispositive to be likely to alter the result on retrial and that probability is the key to considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence. *Id.*

¶ 41 Here, to determine whether defendant has set forth a colorable claim of actual innocence, we consider whether the successive petition, along with the supporting documents, raised the probability that it is more likely than not that no reasonable trier of fact would find him guilty of first-degree murder considering the new evidence.

¶ 42 The contents of Harris's affidavit, namely that Harris was present at the scene of the stabbing, and saw defendant standing by an alley and then running away while another man was being beaten and stabbed by two other unidentified men, is newly discovered, material, and noncumulative. Harris did not testify at trial and explained in his affidavit that he did not come forward earlier because he had stolen money from the scene and did not know that defendant had been convicted of the offense until they encountered each other in prison. The fact that Harris saw

defendant running away while Williams was being beaten and stabbed is material to the issue of defendant's guilt and not cumulative of the evidence at trial.

¶ 43    Having determined that the facts contained in Harris's affidavit are newly discovered, material, and noncumulative, we turn to whether those facts, "when considered along with the trial evidence, would probably lead to a different result" at retrial. *Id.* ¶ 47.

¶ 44    In the case at bar, the State argues that the facts contained in Harris's affidavit are neither exonerating nor conclusive because the affidavit places defendant at the scene of the stabbing and "leaves open the possibility" that he "personally engaged" in the fight when Harris was not looking or was accountable for Williams's death based upon actions Harris did not see. The State asserts that because defendant was found guilty of first-degree murder based upon a theory of accountability, "it does not matter that Harris saw other people attacking the victim" because Harris "clearly" did not see the entire incident. The State further argues that the testimony of Sanchez and O'Grady as well as defendant's statement establish that defendant was beating Williams at the time of the stabbing.

¶ 45    However, as our supreme explained in *Robinson*, although the conclusive character of new evidence is the most important element of an actual innocence claim, ultimately,

> "the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. [Citation.] The new evidence need not be entirely dispositive to be likely to alter the result on retrial. [Citation.] Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence. [Citation.]" *Id.* ¶¶ 47-48.

¶ 46    Thus, the question before this court when assessing if a defendant has met "the low threshold applicable to a colorable claim of actual innocence" is "whether the new evidence, if believed and not positively rebutted by the record, could lead to acquittal on retrial." *Id.* ¶ 60.

¶ 47    Ultimately, taking Harris's factual averments that defendant was running away while Williams was being beaten and stabbed as true, defendant has presented evidence that could place the trial evidence in a different light and undermines confidence in the guilty finding. See *id.* ¶ 76 (finding that an affidavit providing evidence that a different person is guilty was "of such a conclusive character as to lead to a different result on retrial"). At trial, Dean and Johnson testified that defendant and McGruder attacked Williams and during the attack McGruder stabbed Williams. Thus, the evidence at trial connecting defendant to the fatal attack was the identification testimony of Dean and Johnson, and defendant's statement. This identification testimony is directly contradicted by the assertion contained in Harris's affidavit that defendant was not the person beating Williams while McGruder stabbed him. Here, as in *Robinson*, we are unable to assess the reliability or veracity of Harris's affidavit without engaging in a credibility determination. See *id.* ¶ 83. Moreover, although defendant's signed statement was presented at trial, he has consistently rejected the veracity of that statement.

¶ 48    We also observe that in *Robinson*, our supreme court determined that the appellate court erred in finding "that the evidence in petitioner's supporting affidavits d[id] not satisfy the conclusive character element because it merely conflict[ed] with the evidence presented at trial." *Id.* ¶ 57. The court clarified that it "has never held that a request for leave to file a successive petition must be denied if the new evidence conflicts with the trial evidence." *Id.* The court explained that "[i]f the new evidence of innocence d[id] not contradict the evidence of petitioner's

guilt at trial, the filing of the successive petition would be pointless, and the purpose of the Act would be rendered meaningless, which is a result that must be studiously avoided." *Id*.

¶ 49    Our supreme court's clarification of these principles as explained in *Robinson*, that evidence of actual innocence need not be dispositive and that such evidence may support a showing of actual innocence even where it conflicts with the trial evidence, guides our analysis of defendant's claim of actual innocence.

¶ 50    Accordingly, taking as true the allegations in Harris's affidavit, as we must at this stage of proceedings under the Act, we conclude that a factfinder could determine that this new evidence exculpates defendant in the murder and refutes the State's evidence at trial. *Id.* ¶ 45. We note that the new evidence in Harris's affidavit is not positively rebutted by the record. "[T]he existence of a conflict with the trial evidence is not the same as finding that the new evidence is positively rebutted." *Id.* ¶ 60. To be positively rebutted, it must be "clear from the trial record that no fact finder could ever accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible." *Id*. Here, the record does not affirmatively demonstrate that a trier of fact could never accept the veracity of Harris's statements. See *id.* ¶ 73 (finding that a newly discovered eyewitness affidavit that contradicted, but was not positively rebutted by, the State's eyewitnesses regarding identification of offender was "reason to allow petitioner to proceed, with counsel, on his colorable claim of actual innocence").

¶ 51    Accordingly, because defendant has satisfied the pleading requirements for obtaining leave to file a successive postconviction petition, his claim of actual innocence must be advanced to second stage proceedings under the Act. See *id.* ¶ 85 ("the only issue presented in this case is whether [the defendant] may file his successive postconviction petition that alleges he is actually

innocent of the crimes for which he has been convicted and sentenced"). Accordingly, we reverse the judgment of the circuit court and remand the cause for further proceedings under the Act.

¶ 52     Reversed and remanded.